IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

UNITED STATES OF AMERICA,          3:12-cr-00538-BR
                                   (3:16-cv-02286-BR)
          Plaintiff,

                                 OPINION AND ORDER

v.

TANA CHRIS LAWRENCE,

       Defendant.


**BILLY J. WILLIAMS**
United States Attorney
**CRAIG J. GABRIEL**
Assistant United States Attorney
1000 S.W. Third Avenue, Suite 600
Portland, OR 97204
(503) 727-1107

        Attorneys for Plaintiff

**PER C. OLSON**
Hoevet Olson Howes, PC
1000 S.W. Broadway
Suite 1740
Portland, OR 97205
(503) 228-0497

        Attorneys for Defendant


1 - OPINION AND ORDER

**BROWN, Senior Judge.**

This matter comes before the Court on Defendant Tana Chris Lawrence's Second Amended Motion (#281) Under 28 U.S.C. § 2255 to Vacate, Set Aside or Correct Sentence by A Person in Federal Custody. For the reasons that follow, the Court **DENIES** Defendant's Motion and **DECLINES** to issue a Certificate of Appealability.

## BACKGROUND

On October 11, 2012, Defendant Tana Chris Lawrence and Angeledith Saramaylene Smith and were charged in an Indictment with Murder in the First Degree. Specifically, the Indictment alleged on September 29, 2012, Lawrence and Smith "with malice aforethought, did unlawfully kill Faron Lynn Kalama . . . in the perpetration of, or in the attempt to perpetrate, kidnapping, aggravated sexual abuse, sexual abuse, and burglary" in violation of 18 U.S.C. §§ 1111, 1201 (a)(2), 2241(a), 2242 and Oregon Revised Statutes § 164.225.

On November 6, 2012, Lawrence and Smith were charged in a Superseding Indictment with Murder in the First Degree on the same grounds as those stated in the initial Indictment.

On October 17, 2013, Lawrence and Smith were charged in a Second Superseding Indictment with two counts of Murder in the First Degree. Count One alleged on September 29, 2012, Lawrence

and Smith

> with malice aforethought, did unlawfully kill
> Faron Lynn Kalama, in the perpetration of, or in
> the attempt to perpetrate, Burglary in the First
> Degree, in violation of Oregon Revised Statute
> 164.225, that is:
>
> > (a) In the District of Oregon . . .
> > defendants LAWRENCE and SMITH . . . did
> > unlawfully and knowingly enter and remain in
> > a dwelling located at 2237 Elliot Heights,
> > Warm Springs, Oregon, with intent to commit a
> > crime therein, that is, Assault With A
> > Dangerous Weapon With Intent To Do Bodily
> > Harm, in violation of 18 U.S.C. § 113(a)(3);
>
> All in violation of 18 U.S.C. §§ 1111, 1153, 2.

Count Two alleged on September 29, 2012, Lawrence and Smith

> with malice aforethought, did unlawfully kill
> Faron Lynn Kalama, in the perpetration of, or in
> the attempt to perpetrate, kidnapping, in
> violation of 18 U.S.C. § 120l(a)(2), that is:
>
> > (a) In the District of Oregon . . .
> > defendants LAWRENCE and SMITH . . . did
> > unlawfully seize, confine, kidnap, abduct,
> > and carry away Faron Lynn Kalama and held her
> > for a benefit;
>
> All in violation of 18 U.S.C. §§ 1111, 1153, 2.

On November 14, 2013, Lawrence and Smith were charged in a
Third Superseding Indictment with three counts of Murder in the
First Degree.  Count One alleges on September 29, 2012, Lawrence
and Smith

> with malice aforethought, did unlawfully kill
> Faron Lynn Kalama, in the perpetration of, or in
> the attempt to perpetrate, Burglary in the First
> Degree, in violation of Oregon Revised Statute
> 164.225, that is:

> (a) In the District of Oregon . . .
> defendants LAWRENCE and SMITH . . . did
> unlawfully and knowingly enter and remain in
> a dwelling located at 2237 Elliot Heights,
> Warm Springs, Oregon, with intent to commit a
> crime therein, that is, Assault With A
> Dangerous Weapon With Intent To Do Bodily
> Harm, in violation of 18 U.S.C. § 113(a)(3);

All in violation of 18 U.S.C. §§ 1111, 1153, 2.

Count Two alleges on September 29, 2012, "at a time separate and subsequent to the offense described in Count 1," Lawrence and Smith

> with malice aforethought, did unlawfully kill
> Faron Lynn Kalama, in the perpetration of, or in
> the attempt to perpetrate, Burglary in the First
> Degree, in violation of Oregon Revised Statute
> 164.225, that is:

> > (a) In the District of Oregon . . .
> > defendants LAWRENCE and SMITH . . . did
> > unlawfully and knowingly enter and remain in
> > a dwelling located at 2237 Elliot Heights,
> > Warm Springs, Oregon, with intent to commit a
> > crime therein, that is, Assault With A
> > Dangerous Weapon With Intent To Do Bodily
> > Harm, in violation of 18 U.S.C. § 113(a)(3);

All in violation of 18 U.S.C. §§ 1111, 1153, 2.

Count Three alleges on September 29, 2012, Lawrence and Smith

> with malice aforethought, did unlawfully kill
> Faron Lynn Kalama, in the perpetration of, or in
> the attempt to perpetrate, kidnapping, in
> violation of 18 U.S.C. § 1201(a)(2), that is:

> > (a) In the District of Oregon . . .
> > defendants LAWRENCE and SMITH . . . did
> > unlawfully seize, confine, kidnap, abduct,
> > and carry away Faron Lynn Kalama and held her
> > for a benefit;

All in violation of 18 U.S.C. §§ 1111, 1153, 2.

On November 18, 2013, the Court held an arraignment hearing on the Third Superseding Indictment and set a briefing schedule for any motions against the Third Superseding Indictment.

On November 21, 2013, before the deadline for any motions against the Third Superseding Indictment had passed, Lawrence pled guilty to the third count of Murder in the First Degree.

On April 16, 2014, the Court held a sentencing hearing, granted the government's Motion to Dismiss Counts One and Two of the Third Superseding Indictment as to Lawrence, and sentenced Lawrence to a term of life imprisonment.

On April 17, 2014, the Court entered a Judgment.

On April 30, 2014, Lawrence filed a Notice of Appeal to the Ninth Circuit.

On January 14, 2016, the Ninth Circuit issued a Mandate affirming Lawrence's sentence and conviction.

On March 25, 2016, Lawrence filed a Petition for Writ of Certiorari to the United States Supreme Court.

On May 2, 2016, the Supreme Court denied Lawrence's Petition for Writ of Certiorari.

On December 5, 2016, Lawrence filed a *pro se* Motion (#235) Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence.

On December 12, 2016, the Court appointed counsel for Lawrence for purposes of her Motion to Vacate.

On May 1, 2017, Lawrence filed an Amended Motion (#247)

Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence
on the ground of ineffective assistance of counsel.

On January 11, 2018, Lawrence filed a Second Amended Motion
(#281) Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct
Sentence on the ground of ineffective assistance of counsel.  The
Court took this matter under advisement on June 24, 2019.

## STANDARDS

28 U.S.C. § 2255 provides in pertinent part:

> A prisoner in custody under sentence of a court
> established by Act of Congress claiming the right
> to be released upon the ground that the sentence
> was imposed in violation of the Constitution or
> laws of the United States, or that the court was
> without jurisdiction to impose such sentence, or
> that the sentence was in excess of the maximum
> authorized by law, or is otherwise subject to
> collateral attack, may move the court which
> imposed the sentence to vacate, set aside or
> correct the sentence.
>
> * * *
>
> If the court finds that the judgment was rendered
> without jurisdiction, or that the sentence imposed
> was not authorized by law or otherwise open to
> collateral attack, or that there has been such a
> denial or infringement of the constitutional
> rights of the prisoner as to render the judgment
> vulnerable to collateral attack, the court shall
> vacate and set the judgment aside and shall
> discharge the prisoner or resentence him or grant
> a new trial or correct the sentence as may appear
> appropriate.

Although "the remedy [under § 2255] is . . . comprehensive,
it does not encompass all claimed errors in conviction and

sentencing. . . . Unless the claim alleges a lack of jurisdiction or constitutional error, the scope of collateral attack [under § 2255] has remained far more limited." *United States v. Addonizio*, 442 U.S. 178, 185 (1979).

## **DISCUSSION**

Lawrence moves to vacate her conviction and sentence on the ground that she received ineffective assistance of counsel and asserts nineteen bases for her claim. Specifically, Lawrence alleges counsel provided ineffective assistance when he

1.  failed to file a motion to dismiss the Third Superseding Indictment in order to assert that all counts of the Third Superseding Indictment failed to allege an offense;

2.  recommended "Lawrence plead guilty to Count Three under the terms outlined in her plea agreement . . . because Count Three, as alleged in the Third Superseding Indictment, failed to allege an offense";

3.  advised Lawrence "to plead guilty, without advising her that, if she were to go to trial, evidence of intoxication, mental illness, and intellectual disability would be admissible as to defendant's intent to commit the crimes alleged";

4.  "failed to move for an arrest of judgment under Federal

Rules of Criminal Procedure . . . 34, after the change of plea, asserting that the case should be dismissed because Count Three failed to state an offense";

5.   advised Lawrence "to plead guilty pursuant to a plea agreement in which the government could ask for no more than 35 years of imprisonment without adequately advising [Lawrence] of the risk that the court would impose a sentence of life imprisonment";

6.   failed to negotiate a plea agreement in which Lawrence would not have to waive her right to an appeal in the event the Court imposed a sentence of life imprisonment;

7.   "failed to negotiate a plea agreement under Federal Rules of Criminal Procedure, Rule 11(c)(1)(C), that would have bound the court to impose a sentence within a term of years and less than life imprisonment";

8.   "failed to object to the government's breach of the plea agreement at sentencing when it compared . . . Lawrence's case unfavorably with other cases in the District of Oregon, described . . . Lawrence's conduct as worse than that of other defendants in the district, and made other statements that contradicted its promise and obligation to sincerely argue for imposition of no more than 35 years' imprisonment";

9. failed to consider the possibility that the Court would impose a sentence above the maximum term recommended by the government;

10. "failed to object to the government presenting partial sentencing information about other cases in the District of Oregon, failed to request more information about those cases, failed to request more time to address those cases, and failed to adequately address those cases at sentencing";

11. "failed to object to the Court's separate request for sentencing materials from other cases in the District of Oregon";

12. "failed to object to the Court's reliance on its own memory and recollection of other Murder in the First Degree cases and sentences imposed in the district in support of the court's assertion that [Lawence's] case was not sufficiently similar to those other cases to justify a sentence of less than life imprisonment";

13. "failed to obtain and present to the Court . . . sentencing data that would have provided the Court with a meaningful basis of comparison when the Court was determining what sentence to impose";

14. "[w]hen, at sentencing, the Court's statements made it plain that the Court considered defendants' conduct

worse than that of others convicted of First Degree Murder in the District of Oregon, defense counsel failed to move for a continuance on the basis that the defense had not had a fair or meaningful opportunity to understand, evaluate, and present information about those cases";

15. "failed to assert on appeal that the sentence of life imprisonment was substantively unreasonable";

16. conceded "on appeal that the failure to object to the prosecution's breach of the plea agreement at the sentencing hearing resulted in the application of the 'plain error' standard of review on appeal of whether the government breached the plea agreement";

17. failed to argue on appeal that "the government's breach of a plea agreement warranted remand for re-sentencing before a different judge";

18. failed to argue on appeal that "the 'harmless error' rule did not apply to the law of contractual plea agreements"; and

19. "[t]o the extent that this Court were to conclude that the constitutional deprivations viewed individually were harmless, not prejudicial, or otherwise not warranting relief, it must conclude that the cumulative effect of the multiplicity of errors (in any

combination) does."

The government asserts the Court should deny Lawrence's Motion in its entirety.

## I. Standards

The Supreme Court has established a two-part test to determine whether a defendant has received constitutionally deficient assistance of counsel. *Premo v. Moore*, 131 S. Ct. 733, 739 (2011). *See also Strickland v. Washington*, 466 U.S. 668, 678, 687 (1984). Under this test a defendant must not only prove counsel's assistance was deficient, but also that the deficient performance prejudiced the defense. *Premo*, 131 S. Ct. at 739. *See also Sexton v. Cozner,* 679 F.3d 1150, 1159 (9th Cir. 2012); *Ben-Sholom v. Ayers*, 674 F.3d 1095, 1100 (9th Cir. 2012).

"To prove deficiency of performance, the defendant must show counsel made errors so serious that performance fell below an objective standard of reasonableness under prevailing professional norms." *Mak v. Blodgett*, 970 F.2d 614, 618 (9th Cir. 1992)(citing *Strickland*, 466 U.S. at 687-88)). *See also Sexton*, 679 F.3d at 1159 (citing *Premo*, 131 S. Ct. at 739). The court must inquire "whether counsel's assistance was reasonable considering all the circumstances" at the time of the assistance. *Strickland*, 466 U.S. at 688. *See also Detrich v. Ryan*, 677 F.3d 958, 973 (9th Cir. 2012). There is a strong presumption that counsel's assistance was adequate. *Strickland,* 466 U.S. at 689.

*See also Sexton*, 679 F.3d at 1159.

To prove prejudice "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694. *See also Sexton*, 679 F.3d at 1159-60. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 695. *See also Sexton*, 679 F.3d at 1160.

The court "need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant." *Strickland,* 466 U.S. at 697. *See also Heishman v. Ayers*, 621 F.3d 1030, 1036 (9th Cir. 2010). "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed." *Strickland,* 466 U.S. at 697. *See also Heishman*, 621 F.3d at 1036.


## DISCUSSION

As noted, Lawrence alleges 19 bases for her claim of ineffective assistance of counsel.

## I.    Ineffective Assistance Claims Based on the Indictments

As noted, Lawrence alleges trial counsel[1] provided

---

[1] Lawrence was represented by Thomas Coan at all times through her appeal.

ineffective assistance when he failed to file a motion to dismiss the Third Superseding Indictment on the ground that none of the counts alleged an offense.  Specifically, Lawrence asserts:

> The Third Superseding Indictment failed to state an offense because it relied on improper predicates in each of the three counts of Felony Murder under 18 U.S.C. § 1111(a).  Counts One and Two alleged that the death of Ms. Kalama occurred in the perpetration or attempted perpetration of Burglary in the First Degree, as defined by the Oregon statute, ORS 164.225.  Count Three alleged that the death occurred in the perpetration or attempted perpetration of kidnapping, as defined by 18 U.S.C. § 1201(a)(2).  But by including "burglary" and "kidnapping" in the list of predicate crimes in the Felony Murder statute, Congress did not intend to incorporate varied and inconsistent statutory definitions of these crimes, and instead intended uniform generic definitions.

Def.'s Mem. in Support of Second Am. Mot. to Vacate at 30-31.

### A.  Oregon Revised Statutes § 164.225 as a Predicate to Felony Murder

In Counts One and Two of the Third Superseding Indictment the government alleged Lawrence and Smith "with malice aforethought, did unlawfully kill Faron Lynn Kalama, in the perpetration of, or in the attempt to perpetrate, Burglary in the First Degree, in violation of Oregon Revised Statute 164.225." Lawrence asserts counsel provided ineffective assistance when they failed to assert Oregon's burglary statute is not a predicate felony that can support a conviction for felony murder under § 1111(a).

The government asserts defense counsel was not

ineffective for failing to assert Oregon's burglary statute was not a predicate felony that could support a conviction for felony murder because it was not until nearly three years after the government filed the Third Superseding Indictment that the Ninth Circuit held state burglary statutes could be too broad to support burglary as a predicate to federal felony murder. *See United States v. Reza-Ramos*, 816 F.3d 1110 (9th Cir. 2016).

The Ninth Circuit has made clear that counsel are not ineffective for failing to anticipate a decision in a later case. *See, e.g., Styers v. Schriro*, 547 F.3d 1026, 1032 (9th Cir. 2008) ("Styers relies almost exclusively on our decision in *Daniels v. Woodford*, 428 F.3d 1181 (9th Cir. 2005). . . . However, *Daniels* was issued almost fifteen years after Styers' voir dire proceedings. . . . As such, Styers cannot rest his ineffective assistance of counsel claim on *Daniels*."); *Lowry v. Lewis*, 21 F.3d 344, 346 (9th Cir. 1994)(holding an attorney is not ineffective for failing to anticipate a decision in a later case).

Because the Ninth Circuit did not hold until three years after the government filed the Third Superseding Indictment that state burglary statutes could be too broad to support burglary as a predicate to federal felony murder, the Court concludes defense counsel's performance did not fall below an objective standard of reasonableness under the then-existing

prevailing professional norms when they failed to challenge the Third Superseding Indictment on the ground that Oregon's burglary statute is too broad to be a predicate felony that can support a conviction for felony murder under § 1111(a). Accordingly, the Court concludes defense counsel was not ineffective when he failed to challenge the Third Superseding Indictment on that ground.

**B.      Kidnapping under 18 U.S.C. § 1201 as a Predicate to Felony Murder**

Lawrence also asserts her counsel was ineffective when he failed to file a motion to dismiss Count Three of the Third Superseding Indictment on the ground that the federal kidnapping statute, 18 U.S.C. § 1201(a)(2), is not a predicate felony that can support a conviction for Felony Murder under 18 U.S.C. § 1111(a). Specifically, Lawrence contends although Congress added kidnapping to the list of predicate crimes in the Felony Murder statute, 18 U.S.C. § 1111(a), that list does not reference 18 U.S.C. § 1201. According to Lawrence, therefore, Congress intended only generic kidnapping to qualify as a predicate felony to support a charge of felony murder. Lawrence notes the Ninth Circuit has concluded "the generic definition of kidnapping encompasses, at a minimum, the concept of a 'nefarious purpose[]' motivating restriction of the victim's liberty." *United States v. Gonzalez-Perez*, 472 F.3d 1158, 1161 (9th Cir. 2007). Federal

kidnapping under § 1201, however, only requires the kidnapping to be "for a benefit."  Lawrence asserts because the Third Superseding Indictment alleged only § 1201 as the predicate offense for the charge of felony murder and, therefore, it alleged only that Lawrence and Smith kidnapped Kalama "for a benefit," the Third Superseding Indictment failed to allege an offense.  According to Lawrence, therefore, defense counsel was ineffective when they failed to move to dismiss the Third Count on this basis.

The government, however, asserts there was not any authority that indicated kidnapping under § 1201 could not serve as a predicate offense to felony murder at the time of the Third Superseding Indictment.  Moreover, the government asserts Lawrence could not have established prejudice in any event because if defense counsel had moved to dismiss the Third Count on that basis, the government would have amended the Third Superseding Indictment to allege nefarious purpose, which is supported by the evidence.

The Court concludes it was not entirely clear in 2013 whether kidnapping under § 1201 could serve as a predicate offense to felony murder.  The Court, however, concludes Lawrence has not established "there is a reasonable probability that, but for counsel's [alleged] error[], the result of the proceeding would have been different."  As noted, the government has made

clear that if defense counsel had moved to dismiss the Third

Court on the ground that § 1201 could not serve as a predicate

offense to felony murder, the government would have amended the

Third Superseding Indictment to allege generic kidnapping as the

predicate offense and to allege a "nefarious purpose" for the

kidnapping.  In addition, based on the record before the Court at

the time of the Third Superseding Indictment, the Court would

have concluded the facts supported an allegation of nefarious

purpose.

Accordingly, the Court concludes defense counsel was

not ineffective when he failed to challenge the Third Superseding

Indictment on the ground that § 1201 could not serve as a

predicate offense to felony murder.

## II.  Ineffective Assistance Claims Based on the Plea Agreement

Lawrence alleges a number of ineffective-assistance claims

based on defense counsel's performance during the plea-agreement

process.  Specifically, Lawrence alleges defense counsel was

ineffective when he:

1.  recommended Lawrence "plead guilty to Count Three under
    the terms outlined in her plea agreement . . . because
    Count Three, as alleged in the Third Superseding
    Indictment, failed to allege an offense";

2.  advised Lawrence "to plead guilty, without advising her
    that, if she were to go to trial, evidence of

intoxication, mental illness, and intellectual disability would be admissible as to [Lawrence's] intent to commit the crimes alleged"

2. "failed to move for an arrest of judgment under Federal Rules of Criminal Procedure . . . 34, after the change of plea, asserting that the case should be dismissed because Count Three failed to state an offense";

3. advised Lawrence "to plead guilty pursuant to a plea agreement in which the government could ask for no more than 35 years of imprisonment without adequately understanding or advising [Lawrence] of the risk that the court would impose a sentence of life imprisonment";

4. failed to negotiate a plea agreement in which Lawrence would not have to waive her right to an appeal in the event the Court imposed a sentence of life imprisonment; and

5. "failed to negotiate a plea agreement under Federal Rules of Criminal Procedure, Rule 11(c)(1)(C), that would have bound . . . Lawrence's guilty plea to an agreement by the Court to impose a sentence within a term of years, as opposed to life imprisonment."

**A. Background**

On November 21, 2013, Lawrence pled guilty to Count

Three of the Third Superseding Indictment.  Under the Plea

Agreement the government agreed to dismiss Counts One and Two of

the Third Superseding Indictment against Lawrence; to recommend a

three-level downward adjustment for acceptance of responsibility

under United States Sentencing Guideline (U.S.S.G.) § 3E1.1; to

file a motion for a U.S.S.G. § 5K1.1[2] downward departure based on

Lawrence's cooperation; and to recommend "a sentence of no longer

than 35 years (420 months) in prison."  Lawrence agreed not to

ask the Court to impose a sentence of less than 25 years, waived

her right to appeal her conviction and sentence on any grounds

"except for a claim that the sentence imposed exceed[ed] the

statutory maximum," and waived her right to file a collateral

attack on her sentence on any ground other than ineffective

assistance of counsel.  Both parties agreed the Plea Agreement

was made pursuant to Federal Rule of Criminal Procedure

11(c)(1)(B), and, therefore, the sentencing "recommendation[s] or

request[s] [did] not bind the court."

        The Plea Petition signed by Lawrence noted

             although the judge will consider the
             recommendations and agreements of both the
             prosecution and defense attorneys concerning
             sentencing, the judge is not obligated to
             follow those recommendations or agreements.
             If the judge imposes a sentence different

_____

    [2] U.S.S.G. § 5K1.1 provides:  "Upon motion of the government
stating that the defendant has provided substantial assistance in
the investigation or prosecution of another person who has
committed an offense, the court may depart from the guidelines."

> from what I expected to receive under the
> terms of my Plea Agreement with the
> prosecutor, I do not have a right to withdraw
> my plea.

Plea Pet. (Docket #127) at ¶ 9. The Plea Petition also noted the

maximum sentence

> that can be imposed upon me for the crime(s)
> to which I am pleading guilty is life
> imprisonment.

> * * *

> My attorney has discussed with me the Federal
> Sentencing Guidelines.  I understand that the
> Federal Sentencing Guidelines are advisory,
> not mandatory.  I also know the sentencing
> judge, in determining the sentence to be
> imposed, must consider those factors set
> forth in Title 18, United States Code,
> Section 3553(a), including, but not limited
> to:  the nature and circumstances of the
> offense, my own history and characteristics,
> the goals of sentencing (punishment,
> deterrence, protection, and rehabilitation),
> and the advisory sentencing range established
> by the Sentencing Guidelines.  I understand
> the judge is charged with deciding a
> reasonable sentence based on the totality of
> circumstances, and the Federal Sentencing
> Guidelines are one of the factors the judge
> must consider in determining a reasonable
> sentence, and that there is no guarantee that
> my sentence will be within the guideline
> range.  If my attorney or any other person
> has calculated a guideline range for me, I
> know that this is only a prediction and that
> it is the judge who makes the final decision
> as to what the guideline range is and what
> sentence will be imposed.  I also know that a
> judge may not impose a sentence greater than
> the maximum sentence referred to in paragraph
> (10) above.

Plea Pet. at ¶ 13.

At the November 21, 2013, change-of-plea hearing
Lawrence advised the Court that she had spent enough time with
her attorney to understand the nature and seriousness of the
charge against her, to understand the evidence the government had
to support the charges, and to discuss her options including her
right to go to trial.  The Court also engaged in the following
discussion with Lawrence:

> THE COURT:        Well, then we're going to go over it
>                   right now.  Okay?  It's okay.  This is
>                   really important, and I want to be sure,
>                   Ms. Lawrence, that you're not rushed
>                   into anything, and that you really know
>                   what we're talking about.  So take a
>                   look at that letter called Plea Offer.
>                   Do you see it?
>
> THE DEFENDANT: Yes.
>
>                            * * *
>
> THE COURT:        Okay.  It's a contract.  It's a binding
>                   agreement between you and the
>                   prosecutor.  Do you understand that?
>
> THE DEFENDANT: Yes.
>
> THE COURT:        I am not part of the agreement.  I am
>                   not allowed to make you any promises or
>                   to enter into any negotiations.  So the
>                   deal is between you and the Government,
>                   but not the Court.  Do you understand?
>
> THE DEFENDANT: Yes.
>
>                            * * *
>
> THE COURT:        It -- this agreement says you agree to
>                   plead guilty to Count 3 of the
>                   Superseding Indictment that charges
>                   Murder in the First Degree.  And, in
>                   exchange, the prosecutor is going to

dismiss all of the other charges brought against you.  In the first indictment, in the second one, and the other charges in the third indictment.  So you would end up with one charge, a serious one, Murder in First Degree, but none other.  Do you understand?

THE DEFENDANT: Yes.

THE COURT:  Okay.  He explained what the maximum penalties were for murder in the First Degree.  Life in prison is the mandatory sentence, meaning a judge normally must impose life unless, as in this case, there's an agreement between the parties for the Government to ask for a reduction based on cooperation.  Do you understand that?

THE DEFENDANT: Yes, I do.

THE COURT:  I'm going to put it another way.  If the Government did not ask me, based on your expected cooperation, to sentence you below life, if the Government didn't open that door, I wouldn't have the power to sentence you to anything but life, if convicted of this charge.  Do you understand that?

THE DEFENDANT: Yes, I do.

* * *

THE COURT:  This agreement allows you to ask for a sentence of no less than 25 years.  To argue to me, through Mr. Coan, that 25 years is enough of a sentence for you in this circumstance.  But you're not allowed to ask for anything less than 25 years, under this agreement.  Do you understand?

THE DEFENDANT: Yes, I do.

THE COURT:  At the same time, the Government's not allowed to ask for any more than 35

years.  Do you understand?

                THE DEFENDANT: Yes.

                                    *  *  *

                THE COURT:      So, in theory, I don't have to sentence
                                you higher than 25 months.  In theory, I
                                could sentence you lower.  In theory, I
                                could sentence you above 35 years, up to
                                life.  I don't know what the sentence
                                will be.  I need you to really
                                understand, though, that there isn't any
                                promise being made to you by me what
                                your sentence is going to be.  Do you
                                understand that?

                THE DEFENDANT: Yes.

                THE COURT:      And specifically you won't be free to
                                take back your guilty plea if you don't
                                like the sentence I impose.  You're
                                bound  by it.  Do you understand?

                THE DEFENDANT: Yes, I do.

                THE COURT:      You're not only bound to it in this
                                court, you're giving up your right to
                                appeal to a higher court the fact that
                                I'm allowing you to plead guilty and the
                                sentence I impose.  Do you understand?

                THE DEFENDANT: Yes, I do.

Def.'s Second Am. Mot. to Vacate, Ex. 204 at 24-28.  The Court

found Lawrence was fully competent; was making a "a knowing,

intelligent, and voluntary waiver of [her] rights"; and her

guilty plea was "knowing, intelligent, and voluntary."  *Id.* at

46.  The Court also found there was a sufficient "factual basis

for a finding of guilt . . . beyond any reasonable doubt" as to

the charge of Murder in the First Degree as alleged in Count 3 of

the Third Superseding Indictment.  *Id.*

**B.   Standards**

"Defendants' . . . Sixth Amendment right to counsel
. . . extends to the plea-bargaining process." *Lafler v. Cooper*,
566 U.S. 156, 162 (2012)(citation omitted).  *See also Padilla v.
Ky.*, 559 U.S. 356, 364 (2010)(same).  Accordingly, "[d]uring plea
negotiations defendants are 'entitled to the effective assistance
of competent counsel.'" *Lafler*, 566 U.S. at 162 (quoting *McMann
v. Richardson*, 397 U.S. 759, 771 (1970)).

"In *Hill*, the Court held 'the two-part *Strickland v.
Washington* test applies to challenges to guilty pleas based on
ineffective assistance of counsel.'" *Lafler,* 566 U.S. at 162
(quoting *Hill v. Lockhart*, 474 U.S. 52, 58 (1985)).  In *Missouri
v. Frye* the Supreme Court made clear that "the standard laid out
in *Hill*" continues to apply when a defendant asserts ineffective
assistance of counsel at the plea stage "led him to accept a plea
offer as opposed to proceeding to trial." 566 U.S. 134, 147
(2012).  *See also Lafler*, 566 U.S. at 162-63 (contrasts facts in
*Lafler* to circumstances in *Hill* in which ineffective assistance
of counsel led the defendant to plead guilty rather than to
proceed to trial).  Thus, when evaluating a claim of ineffective
assistance of counsel based on an allegation that counsel's
ineffective performance led the defendant to plead guilty rather
than to proceed to trial, the Court must determine whether the

defendant has shown "'there is a reasonable probability that, but for counsel's errors, [the defendant] would not have pleaded guilty and would have insisted on going to trial.'" *Lafler*, 566 U.S. at 162 (quoting *Hill*, 474 U.S. at 59).

"A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 695. *See also Smith v. Almada*, 640 F.3d 931, 940 (9th Cir. 2011). In addition, the test to determine the validity of a guilty plea remains "whether the plea represents a voluntary and intelligent choice among the alternative courses of action open to the defendant." *Hill*, 474 U.S. at 56. *See also Mahoney*, 611 F.3d at 988.

C. **Failures Related to Sufficiency of the Indictment**

As noted, Lawrence asserts defense counsel was ineffective when he "failed to move for an arrest of judgment under Federal Rules of Criminal Procedure . . . 34, after the change of plea, asserting that the case should be dismissed because Count Three failed to state an offense" and when he recommended Lawrence plead guilty to Count Three "because Count Three, as alleged in the Third Superseding Indictment, failed to allege an offense."

The Court has already concluded defense counsel was not ineffective when he failed to move to dismiss the Third Superseding Indictment on the ground that it failed to allege an

offense.  For the same reasons, the Court concludes defense counsel was not ineffective when he failed to move for an arrest of judgment under Rule 34 or when they recommended Lawrence plead guilty to Count Three of the Third Superseding Indictment.

###    D.    Failure to Advise of the Loss of Potential Defenses to Intent

Lawrence asserts defense counsel provided ineffective assistance when he advised her "to plead guilty, without advising her that, if she were to go to trial, evidence of intoxication, mental illness, and intellectual disability would be admissible as to her intent to commit the crimes alleged."  Lawrence, however, does not identify any facts to support her assertion that defense counsel failed to explore a diminished-capacity defense or that he failed to advise Lawrence that she was losing the ability to assert such a defense by pleading guilty. Specifically, the record reflects defense counsel was aware of Lawrence's mental limitations early in this case and knew Lawrence had been drinking alcohol on the night of the murder. For example, the record reflects defense counsel ordered psychological evaluations of Lawrence in December 2012 and in October 2013, and these evaluations established Lawrence had a borderline IQ and "coping deficits."  At sentencing defense counsel argued comprehensively about Lawrence's limitations and asserted they warranted a sentence less than life.  There is not any indication in the record that defense counsel failed to

appreciate Lawrence's limitations or to understand that they could be mitigating evidence in the event this matter went to trial.  In addition, Lawrence affirmed at the change-of-plea hearing that she had thoroughly discussed her possible trial defenses with counsel and understood she was giving up those possible defenses by not going to trial.

Finally, it is questionable whether Lawrence could have established she was so intoxicated or that her limitations were so severe on the night of the crime that she "lacked the ability to attain the culpable state of mind which defines the crime." *United States v. Twine*, 853 F.2d 676, 678 (9th Cir. 1988) ("Diminished capacity is directly concerned with whether the defendant possessed the ability to attain the culpable state of mind which defines the crime.").  *See also United States v. Christian*, 749 F.3d 806, 815 (9th Cir. 2014)(same).  The record includes several facts that indicate Lawrence possessed the ability to attain the specific intent for both the kidnapping and the burglary predicate crimes.  For example, the record reflects Lawrence planned to attack Kalama, carried lethal weapons to the scene for use during the attack, expressed worry during the attack that Kalama would contact the police, attempted to eliminate evidence after Kalama's death, and expressed regret immediately after the murder.  In addition, Lawrence was able to provide a detailed account of the crime and to recall where the

victim's body was located despite drinking alcohol and having a borderline IQ.

The Court concludes on this record that Lawrence has not established she was prejudiced by defense counsel's advice to plead guilty.

### E. Failures of Plea Negotiation

Lawrence asserts defense counsel made several errors when he negotiated the Plea Agreement. Specifically, Lawrence asserts defense counsel provided ineffective assistance of counsel when he advised Lawrence "to plead guilty pursuant to a plea agreement in which the government could ask for no more than 35 years of imprisonment without adequately advising [Lawrence] of the risk that the court would impose a sentence of life imprisonment"; failed to negotiate a plea agreement in which Lawrence would not have to waive her right to an appeal in the event the Court imposed a sentence of life imprisonment; and/or "failed to negotiate a plea agreement under Federal Rules of Criminal Procedure, Rule 11(c)(1)(C), that would have bound the court to impose a sentence within a term of years and less than life imprisonment."

### 1. Adequate Understanding of Risk of Life Imprisonment

As noted, Lawrence asserts defense counsel provided ineffective assistance of counsel when he advised her

"to plead guilty pursuant to a plea agreement in which the
government could ask for no more than 35 years of imprisonment
without adequately understanding or advising [Lawrence] of the
risk that the court would impose a sentence of life
imprisonment."

Even if defense counsel failed to understand or to
advise Lawrence of the risk that the Court could impose a life
sentence, which is questionable, the record reflects Lawrence was
adequately advised of this risk both in the language of the Plea
Agreement and by the Court.  As noted, the Plea Agreement
provided "although the judge will consider the recommendations
and agreements of both the prosecution and defense attorneys
concerning sentencing, the judge is not obligated to follow those
recommendations or agreements" and that the maximum sentence
"that can be imposed upon me for the crime(s) to which I am
pleading guilty is life imprisonment."  In addition, the Court
was very clear at Lawrence's plea hearing about the fact that the
maximum sentence for the crime to which Lawrence pled guilty was
life imprisonment and that the Court did not have to follow the
Plea Agreement.  As noted, the Court advised Lawrence:

> So, in theory, I don't have to sentence you higher
> than 25 months.  In theory, I could sentence you
> lower.  In theory, I could sentence you above 35
> years, up to life.  I don't know what the sentence
> will be.  I need you to really understand, though,
> that there isn't any promise being made to you by
> me what your sentence is going to be.

Def.'s Second Am. Mot. to Vacate, Ex. 204 at 28. Lawrence indicated she understood the crime to which she was pleading guilty had a maximum sentence of life imprisonment, that the Court did not have to follow the Plea Agreement, and that she was not guaranteed any particular sentence. Thus, even if defense counsel did not adequately understand or advise Lawrence that there was a risk that the Court could impose a sentence of life imprisonment, Lawrence has not established she was prejudiced by counsel's failure because Lawrence was thoroughly advised by the Court and by the terms of the Plea Agreement that the Court was not bound by its terms and that the Court could impose a life sentence.

Accordingly, the Court concludes defense counsel was not ineffective when he advised Lawrence to plead guilty even if he failed to advise Lawrence "of the risk that the court would impose a sentence of life imprisonment."

### 2. Plea Negotiations

Lawrence alleges she received ineffective assistance of counsel when he failed to negotiate a plea agreement in which Lawrence "would not have to waive her right to an appeal in the event the Court imposed a sentence of life imprisonment" and/or "failed to negotiate a plea agreement under Federal Rules of Criminal Procedure, Rule 11(c)(1)(C), that would have bound the court to impose a sentence within a term of years

and less than life imprisonment."

The Supreme Court has made clear that "defendants have 'no right to be offered a plea . . . nor a federal right that the judge accept it.'" *Lafler*, 566 U.S. at 168 (quoting *Frye*, 566 U.S. at 148). Defense counsel, therefore, was not required to negotiate a plea, to negotiate specific plea terms, or to negotiate a specific kind of plea. In addition, appellate waivers are regularly included in plea deals and "are supported by public policy considerations." *United States v. Lopez Sanchez*, No. 2:14-CR-00245-KJM, 2018 WL 1305730, at *3 (E.D. Cal. Mar. 13, 2018)(citing *United States v. Littlefield*, 105 F.3d 527, 530 (9th Cir. 1997)("We have repeatedly noted that public policy strongly supports plea agreements that include an appeal waiver.")). In addition, according to the government, the appeal waiver "formed an integral part of the *quid pro quo* that provided Lawrence [with] substantial benefits"; *i.e.*, the government's agreement to move for a sentence less than life imprisonment and to drop Counts One and Two of the Third Superseding Indictment. The government notes in its Response to Lawrence's Motion that if defense counsel had "sought an appellate waiver more favorable to Lawrence or a plea under Rule 11(c)(1)(C), Lawrence likely would have received a less favorable plea deal."

On this record the Court finds defense counsel's failure to negotiate a plea agreement in which Lawrence did not

have to waive her right to appeal in the event the Court imposed a sentence of life imprisonment and/or a plea agreement under Rule 11(c)(1)(C) did not fall "below an objective standard of reasonableness." Accordingly, the Court concludes defense counsel was not ineffective when he failed to negotiate such a plea agreement.

### III. Ineffective Assistance Claims Based on Sentencing

Lawrence asserts defense counsel committed numerous errors at sentencing. Specifically, Lawrence asserts defense counsel erred when he:

8. "failed to object to the government's breach of the plea agreement at sentencing when it compared . . . Lawrence's case unfavorably with other cases in the District of Oregon, described . . . Lawrence's conduct as worse than that of other defendants in the district, and made other statements that contradicted its promise and obligation to sincerely argue for imposition of no more than 35 years' imprisonment";

9. failed to consider the possibility that the Court would impose a sentence above the maximum term recommended by the government;

10. "failed to object to the government presenting partial sentencing information about other cases in the District of Oregon, failed to request more information

about those cases, failed to request more time to address those cases, and failed to adequately address those cases at sentencing";

11. "failed to object to the Court's separate request for sentencing materials from other cases in the District of Oregon";

12. "failed to object to the Court's reliance on its own memory and recollection of other Murder in the First Degree cases and sentences imposed in the district in support of the court's assertion that [Lawence's] case was not sufficiently similar to those other cases to justify a sentence of less than life imprisonment";

13. "failed to obtain and present to the Court . . . sentencing data that would have provided the Court with a meaningful basis of comparison when the Court was determining what sentence to impose"; and

14. "[w]hen, at sentencing, the Court's statements made it plain that the Court considered defendants' conduct worse than that of others convicted of First Degree Murder in the District of Oregon, defense counsel failed to move for a continuance on the basis that the defense had not had a fair or meaningful opportunity to understand, evaluate, and present information about those cases."

## A.    Background

On March 12, 2014, the Probation Office prepared a Presentence Report (PSR) in which it recommended the Court to impose the maximum sentence the government could seek under the terms of the Plea Agreement (420 months) and suggested the "brutal torture" employed in the crime indicated the Court should not grant a variance.

On April 9, 2014, the government filed a Sentencing Memorandum in which it recommended the Court sentence Lawrence to 384 months imprisonment. The government noted the egregious facts of the crime and the seriousness of Lawrence's offense, but the government also noted factors that mitigated a life sentence including Lawrence's cooperation, her "truly tragic childhood," her "multiple mental health issues," and her "very low IQ." Gov.'s Sentencing Mem. at 7. The government also identified a number of cases involving first-degree murder on the Warm Springs Reservation that did not result in life sentences.

On April 15, 2014, the Court notified the parties that it had requested the Probation Officer to prepare a report listing cases within the District of Oregon in which the court had imposed life sentences. On April 15, 2014, the Probation Office provided to the Court and the parties a memorandum detailing cases in which the court as a whole had imposed life sentences and cases in which the court had merely imposed lengthy

sentences.

On April 16, 2014, the Court held a sentencing hearing
for Lawrence and Smith.  Lawrence, Smith, and the government
requested the Court to hear a sentencing presentation on behalf
of Lawrence without the presence of Smith and then a separate
proceeding on behalf of Smith without the presence of Lawrence.
The Court approved the parties' request.  Accordingly, counsel
for Lawrence and Smith made separate sentencing presentations
with only the pertinent defendant present, and the government
made separate presentations for Lawrence and Smith as well.  At
the conclusion of all of the presentations the Court sentenced
Lawrence and Smith.

During the government's presentation related to
Lawrence's sentence AUSA Craig Gabriel advised the Court that the
government was moving for a one-level departure under U.S.S.G.
§ 5K1.1 for Lawrence's substantial assistance and set out the
factual bases for the government's recommendation.  AUSA Gabriel
then reiterated that the government "stand[s] by the plea
agreement" and requested a 32-year sentence for Lawrence.  Def.'s
Second Am. Mot. to Vacate, Ex. 209 at 82.  The Court inquired
whether AUSA Gabriel would like to "speak to any comparators
specifically."  *Id.*  AUSA Gabriel indicated he wanted to address
comparators, and the Court and AUSA Gabriel then engaged in the
following exchange:

MR. GABRIEL:     Yes, your Honor.  I -- first, with
                 respect to the prior sentences imposed
                 for Murder in the First Degree, I think
                 a sentence of 32 years for Ms. Lawrence
                 falls within the heartland, to use
                 language we used to use, of those cases.

                 We've had cases that have resolved for
                 30 years. Cases that have resolved for
                 35 years, where there were two deaths.
                 A case that resolved for 40 years.

                 But Ms. Lawrence's behavior was -- it
                 was just more heinous.  It was more
                 horrific.

THE COURT:       None of those cases involved prolonged
                 torture.

MR. GABRIEL:     Right.

THE COURT:       And what might be called conduct that
                 would qualify for aggravated murder
                 analysis under state law.  Conduct in
                 the course of the commission of multiple
                 felony crimes over many hours and on a
                 repeated basis.  So this case does seem
                 to stand apart from the others, the
                 other murder cases.

MR. GABRIEL:     It does.  Mr. Williams and I were
                 speaking this morning.  We  went to the
                 Oregon state code.  It's not a relevant
                 factor under 3553(a), but this is
                 probably an ag murder case in state
                 court because there was an intent to
                 torture and maim the victim here.

THE COURT:       And if it was a state prosecution, the
                 state of Oregon, if it had jurisdiction,
                 would have the option to seek the death
                 penalty for such a case?

MR. GABRIEL:     Correct.  If the defendants had been
                 convicted of aggravated murder, the
                 state court judge or the jury would have
                 had three options:  Death, life – true
                 life, without parole, or life with the

possibility of parole after 30 years,
day for day.

THE COURT:        And so my point, with respect to the
                  reference to the other murder cases
                  . . . all having sentences that you say
                  I should match in that range, involve
                  conduct that was not as egregious, as
                  brutal, or as prolonged as the defendant
                  and Ms. Smith engaged in.  So I'm
                  skeptical about the argument that the
                  sentence you're recommending is
                  comparable, because I'm concerned . . .
                  this case really doesn't have a
                  comparator.  And, therefore, the Court's
                  duty to avoid unwarranted disparity is
                  an academic one because there really has
                  not been anything reasonably comparable
                  that I know of.  Am I missing something
                  there on the facts?

MR. GABRIEL:      I don't believe you're missing anything
                  on the facts of what happened that day.
                  This is -- at least in the last 14 years
                  -- the worst murder that has come . . .
                  to federal jurisdiction.

THE COURT:        So if it's the worst of the worst, and
                  appreciating you have a contractual
                  obligation not to argue for more than 35
                  years, or 32 years, I'm still
                  questioning the validity of your
                  argument that the sentence you're
                  recommending is appropriate in part
                  because it is comparable to the other
                  sentences, because I don't think it is.

                          * * *

                  So do you want to comment on the other
                  cases that the Probation Office brought
                  to my attention, where life sentences
                  were imposed and nobody died? Life
                  sentences were imposed in cases of
                  aggravated child pornography, in cases
                  of violent bank robbery, nobody died,
                  and yet life sentences were imposed?

MR. GABRIEL:     Your Honor, I will comment on those
                 briefly.  The facts in those cases speak
                 for themselves.  Nobody died.

                 The criminal history of some of these
                 defendants[, however,] was much worse
                 than the criminal history of these
                 defendants.

                              *  *  *

                 And then with respect to the child
                 exploitation cases, in those cases, even
                 though somebody may not have died, those
                 cases addressed prolific child
                 pornography producers, who were habitual
                 offenders.  And the social science does
                 say that the recidivism rate for sex
                 offenders such as that is so incredibly
                 high, that they present a dangerousness
                 for the rest of –

THE COURT:       So you mentioned Congressional intent.
                 And certainly Congress has spoken with
                 respect to the risk to the community in
                 those kinds of violations.  But Congress
                 also spoke in Murder in the First
                 Degree, to say that it should be
                 mandatory life.

MR. GABRIEL:     Well, the statute does require life.
                 But the defendants -- both defendants
                 did provide substantial assistance,
                 which relieves the Court from the
                 obligation to impose life.  But,
                 obviously, it's the most -- or among the
                 most serious crimes in the entire code.
                 We don't dispute that.

THE COURT:       Why is the sentence you're seeking
                 sufficient, given the seriousness of the
                 criminal behavior at issue here?

MR. GABRIEL:     We believe it's sufficient with respect
                 to Ms. Lawrence specifically because she
                 was 20 years old at the time.  And she
                 had the childhood that . . . led her to
                 a place where she was easily involved in

a situation; that she's taken
responsibility for.  She acted
voluntarily, knowingly, with malice
aforethought.  But she was put in a
situation where all of the violence that
had been done to her, she in turn
absolutely projected and attacked on
somebody else.  But we do believe that
her mental illness, her traumatic
childhood, including the neglect, the
sexual abuse, and her low IQ are
mitigating factors that may not have
been present in the other cases that
were presented to the Court for
comparison.

THE COURT:  And her voluntary intoxication, which no
doubt played a part in the decision
making that day?

MR. GABRIEL:  Not a defense and not mitigation.

Def.'s Second Am. Mot. to Vacate, Ex. 209 at 82-87.

During the government's sentencing presentation related

to Lawrence, AUSA Gabriel moved for a one-level downward

departure under U.S.S.G. § 5K1.1 based on Lawrence's substantial

assistance.  Specifically, AUSA Gabriel and the Court engaged in

the following discussion

MR. GABRIEL:  Ms. Lawrence proffered early in
this case.  She proffered three
times over the summer; in July, in
August, and September, I believe.
Before anybody in this case --
herself, Ms. Smith, or the two
accessories -- had pleaded guilty;
before the motions deadline.  Even
before that, Mr. Coan --

THE COURT:  But we're talking eight or nine
months after the event?

MR. GABRIEL:  Yes.  Eight or nine months after

```
                    the event.  Right.

THE COURT:          So early is relative.

MR. GABRIEL:        It's relative.  But given the case
                    of this magnitude, it's not unusual
                    for it to take several months for
                    the defense to digest discovery.
                    So there were three detailed
                    sessions with Ms. Lawrence.  She
                    provided the Government with new
                    facts about the case and the murder
                    that we didn't know about.  She was
                    the first to tell us that
                    Angeledith Smith's 12-year-old
                    sister was present during the first
                    two burglaries and assaults.  She
                    also told us that Angeledith Smith
                    had shot Faron Kalama with a
                    paintball gun, which was later
                    corroborated by that 12-year-old
                    sister.  And there were other
                    details that she provided us that
                    were in fact corroborated.  She
                    volunteered some violent acts that
                    she herself had committed in the
                    course of the murder that we didn't
                    know about and nobody had told us
                    about; which, frankly, is
                    consistent with what the Court
                    heard from Ms. Lawrence's
                    witnesses, that she is honest about
                    her criminal actions.  She did not
                    minimize her involvement.  She made
                    herself available to testify
                    against Angeledith Smith, who at
                    that time had filed a motion to
                    dismiss the Indictment and was on
                    what could have been perceived as a
                    trial footing.  So that is the
                    basis for the Government's motion
                    under 5K1.1. We believe that the
                    motion does apply, it's
                    appropriate, and her assistance was
                    substantial and helpful to the
                    Government.

                           *  *  *
```

> So we stand by the plea agreement.
> It's under Rule 11(c)(1)(B). We
> believe, taking everything into
> account – Mr. Coan provides us the
> psychological reports well in
> advance of the plea negotiations,
> and we knew about this mitigation.
> Our office, from the very top,
> discussed this case at length, and
> we believe that a 32-year sentence
> is appropriate.

Def.'s Second Am. Mot. to Vacate, Ex. 209 at 78-80, 82. During

his presentation as to Smith AUSA Gabriel noted:

> During the lunch break, your Honor, I spoke with
> Mr. Williams. Mr. Williams litigated the case of
> United States v. Ronald McKinley, Angelo Fuentes,
> and Tony Gilbert. And . . . Ronald McKinley . . .
> received a 480-month prison sentence, and I don't
> think it would be helpful -- at least at this
> point -- to compare the brutality of one case to
> the other. But that murder, in which Mr. McKinley
> received 40 years, Mr. Fuentes 30, and Mr. Gilbert
> approximately 20, was a tragic horrible murder as
> well. And so we stand by the statement that the
> murder here of Faron Kalama was the worst, but it
> could be conditioned with [what] was arguably the
> worst or among the worst because of that McKinley
> murder, 13, 14 years ago.

Def.'s Second Am. Mot. to Vacate, Ex. 209 at 113-14.

After the parties' presentations the Court evaluated

the facts of the crime as well as the government's recommended

sentence and stated:

> The Court's duty today is to impose a sentence on
> each of these two young women, Ms. Smith and
> Ms. Lawrence, who each have their own tragic
> stories. The requirement, as I noted earlier, is
> to impose a sentence that is reasonable in law,
> that's defined as what would be sufficient but not
> greater than necessary to accomplish a number of

purposes set out by statute.

* * *

[T]he legally correct starting point for guideline
analysis for each of the defendants is a life
sentence because that is the sentence mandated by
law for Murder in the First Degree. . . .  [T]he
guideline is considered to be a life sentence.
That's where this analysis would end but for the
fact that the Government has made a motion under
the Guideline 5K1.1 for a one-level departure,
meaning a reduction from the guideline range of
life.  The motion is based on the cooperation of
each of the defendants to varying degrees.

* * *

It is always up to the Government to determine
whether such a motion should be made.  And so I
emphasize, again, that had the Government not made
the motion, the Court's sentencing analysis would
end with the guideline of life imprisonment.  The
Government having made the motion, the Court is
required to consider it.

* * *

But it does not, by any means, relieve the Court
of the responsibility of considering any sentence
up to and including life.  The parties bring to
the Court a plea agreement, in each case, which
authorized the advocacy that each of the parties
made.  And so with that advocacy and with a
starting point of the guideline range, I'm
required to consider a number of factors.  The
first is the nature and the circumstances of the
offense.

* * *

[I]t is sufficient to say that the murder of Faron
Kalama was the end result of many hours of
extraordinary brutality each of the defendants
extended to her that, in my judgment, amounts to
torture.  This wasn't an incidental fight in the
heat of the motion.  It was prolonged.  It was

repetitive.  Defendants would leave only to return
again with one or the other taking the lead in
extraordinary violence.

* * *

The nature and the circumstances of the offense
could not be more serious.  And so that is a
factor that weighs significantly in favor of a
lengthy prison term.

The Court is to consider a sentence that would
reflect the seriousness of the offense, to promote
respect for the law, and to provide for just
punishment. . . .  An offense of this egregious
nature warrants very serious punishment because
without serious punishment for this kind of
depraved behavior, there isn't any reason to
respect the law.  If we are not prepared to
acknowledge this conduct as among the most serious
of criminal behavior, then our laws do not deserve
respect.

* * *

Now, Ms. Winemiller made the point every way she
could that the defendants did not start out
intending to murder Ms. Kalama.  They intended to
beat her dirty, are the quotes.  But whatever that
means, it certainly does not imply anything other
than brutality.  They intended to beat her, and
beat her they did, repeatedly.  One wonders how
she managed to survive as long as she did.
Somewhere along the way, when there were
opportunities for one or the other or both to
retreat, neither did.  More alcohol, more
encouraging one to the other, I think, is fair to
infer.  And we end up with the two of these
defendants and the juvenile offender and
Ms. Kalama taking her last breaths in the back of
a van, and then being dumped.

* * *

I'm required to consider, also, what sentences
have been imposed in cases that are similar, and
to avoid unwarranted disparity.  Meaning, if a
sentence is imposed here that is different than a
sentence imposed in other cases of Murder in the

First Degree, the difference has to be justified.

So we start from first trying to analyze whether the other cases of Murder in the First Degree that have been brought to my attention, all of which arose on the Warm Springs reservation, whether they are similar to these facts; and, if so, the sentences imposed in those cases should affect the decision I make today.  Unfortunately, I know a lot about several of those cases because I had the responsibility of imposing those sentences.  And I do not see much similarity, other than the name of the charge.  I don't see anything similar about the circumstances of this case and other Murder I sentences imposed by this Court or other judges in this district.  There really isn't anything similar.

I asked for guidance from the Probation Office to determine whether there were life sentences imposed in other cases or lengthy prison sentences; again, to try to evaluate what length of a prison term would be sufficient in these circumstances.  And, as has been shared with the parties, there were a number of cases identified, not one of which resulted in death but involved other kinds of circumstances.  An armed career offender, so someone with a lifelong pattern of using firearms and violence.  Bank robberies that involved firearms and carjackings.  Pornography cases with extreme facts.  So I -- I agree with Mr. Gabriel that none of those cases are particularly comparative to these circumstances.

\* \* \*

Congress imposed a mandatory life sentence for Murder in the First Degree for a reason.  That reflected the official perspective of our lawmakers that when Murder in the First Degree is committed, life ought to be the sentence.  The Government permitted, through its motion, for a downward departure, the Court to consider lesser sentences.  And, believe me, I have.  But in good conscience, I do not agree that even the sentence recommended by the Government is sufficient here, in light of the seriousness of the conduct at issue.

* * *

> And I believe it is my duty, today, to impose a
> life sentence for each of the two defendants.  So
> that will be the judgment of the Court.

Def.'s Second Am. Mot. to Vacate, Ex. 209 at 135-146.

### B. Lawrence's Claim Based on the Government's Alleged Breach of the Plea Agreement at Sentencing

As noted, Lawrence asserts defense counsel erred when he failed to object to the government's breach of the Plea Agreement at sentencing.

#### 1. The Law

"'[W]hen a plea rests in any significant degree on a promise or agreement of the prosecutor, so that it can be said to be part of the inducement or consideration, such promise must be fulfilled.'" *United States v. Alcala-Sanchez*, 666 F.3d 571, 575 (9th Cir. 2012)(quoting *Santobello v. New York*, 404 U.S. 257, 262 (1971)).  "A plea agreement is a contract, and the government is held to its literal terms." *Alcala-Sanchez*, 666 F.3d at 575 (citation omitted).  "Requiring the government to strictly comply with the terms of a plea agreement encourages plea bargaining, 'an essential component of the administration of justice' because it ensures that a defendant gets the benefit of his or her bargain — the presentation of a united front to the court.'" *Id*. (quoting *Santobello*, 404 U.S. at 260).  "It does not matter that a breach is inadvertent or "'that the statements or arguments the

prosecutor makes in breach of the agreement do not influence the sentencing judge.'" *Id.* (quoting *Gunn v. Ignacio*, 263 F.3d 965, 969–70 (9th Cir. 2001)).

The Ninth Circuit has made clear that the "government breaches its agreement with the defendant if it promises to recommend a particular disposition of the case, and then either fails to recommend that disposition or recommends a different one." *United States v. Heredia*, 768 F.3d 1220, 1231 (9th Cir. 2014). "The government's promise to recommend a particular disposition can be broken either explicitly or implicitly." *Id.* "The government is under no obligation to make an agreed-upon recommendation 'enthusiastically.' However, it may not superficially abide by its promise to recommend a particular sentence while also making statements that serve no practical purpose but to advocate for a harsher one." *Id.* (citations omitted). Thus, "the government breaches its bargain with the defendant if it purports to make the promised recommendation while 'winking at the district court' to impliedly request a different outcome." *Id.* (quoting *United States v. Has No Horses*, 261 F.3d 744, 750 (8th Cir. 2001)). "An implicit breach of the plea agreement occurs if, for example, the government agrees to recommend a sentence at the low end of the applicable Guidelines range, but then makes inflammatory comments about the defendant's past offenses that do not provide the

district judge with any new information or correct factual inaccuracies." *Heredia*, 768 F.3d at 1231 (citations omitted).

### 2.  Analysis

Lawrence contends the government breached the provision of the Plea Agreement in which it recommended a § 5K1.1 downward departure when the government compared Lawrence's case unfavorably with other cases in the District of Oregon, described Lawrence's conduct as worse than that of other defendants in the district, and made other statements that contradicted its promise and obligation to argue for imposition of no more than 35 years' imprisonment.

Lawrence asserts defense counsel rendered ineffective assistance when he failed to object to AUSA Gabriel's statements during his sentencing presentation related to Lawrence that Lawrence's behavior "was just more heinous.  It was more horrific" than cases in which sentences imposed for Murder in the First Degree were 30 years because "none of those cases involved prolonged torture," that "this case does seem to stand apart from the . . . other murder cases," that this case "is - at least in the last 14 years - the worst murder that has come to . . . federal jurisdiction," and that "the murder here of Faron Kalama was the worst, but it could be conditioned with [what] was arguably the worst or among the worst because of that McKinley murder, 13, 14 years ago."  Def.'s Second Am. Mot. to Vacate, Ex.

209 at 82-84, 114.  Specifically, Lawrence asserts defense counsel was ineffective when he failed to identify AUSA Gabriel's statements as a breach of the Plea Agreement.

Although AUSA Gabriel made various statements regarding the nature and/or severity of the crime to which Lawrence had pled guilty, he also moved for a downward departure pursuant to the terms of the Plea Agreement.  In addition, AUSA Gabriel argued in favor of the government's recommendation when the Court expressed concern as to whether a downward departure was warranted.  For example, USA Gabriel conceded the comparator cases in which individuals had received life imprisonment did not involve death, but he also pointed out that "[t]he criminal history of some of these defendants was much worse than the criminal history of these defendants." AUSA Gabriel also noted "with respect to the child exploitation cases . . . those cases addressed prolific child pornography producers, who were habitual offenders.  And the social science does say that the recidivism rate for sex offenders such as that is so incredibly high, that they present a dangerousness." AUSA Gabriel sought to distinguish this case from other cases in which defendants had received life sentences.  AUSA Gabriel also pointed out repeatedly to the Court that "defendants did provide substantial assistance, which relieves the Court from the obligation to impose life."  When the Court asked the government

to explain "[w]hy . . . the sentence you're seeking [is] sufficient, given the seriousness of the criminal behavior at issue here," AUSA Gabriel defended the government's request for a downward departure based on the age of Lawrence; her difficult, traumatic, and violent relationships and childhood; her abuse; her mental illness; and her low IQ as factors that "may not have been present in the other cases that were presented to the Court for comparison."  In short, AUSA Gabriel conceded the facts of the crime to which Lawrence had pled guilty were quite serious, but he also vigorously defended the government's recommendation for a downward departure consistent with the Plea Agreement. Thus, AUSA Gabriel's conduct is not the kind of conduct that courts have found breached plea agreements.

In *Alcala-Sanchez*, for example, the government "promised to recommend a total offense level of 12 and no more than a 33-month sentence and instead submitted a sentencing summary chart recommending a total offense level of 20 and a 78-month sentence."  666 F.3d at 575-76.  The Ninth Circuit held the government breached the plea agreement and noted "[i]t does not matter that the breach was inadvertent, caused by a heavy workload for government lawyers, or the result of cases getting handed from person to person at the U.S. Attorney's Office."  *Id*. at 576.  Similarly, in *United States v. Luciano* the Ninth Circuit concluded the government breached the plea agreement when

> [u]nder the plain language of the plea agreement,
> if the government determined that [the defendant]
> had provided substantial assistance, it was
> obligated to move the court, pursuant to U.S.S.G.
> § 5K1.1, "to impose a sentence below the
> otherwise-applicable" Guidelines range of 6-12
> months.  Although it filed a section 5K1.1 motion
> asserting that [the defendant] had provided
> substantial assistance, the government recommended
> a 6-month sentence that was within, rather than
> below, the "otherwise applicable" Guidelines
> range.

765 F. App'x 350, 351 (9ᵗʰ Cir. 2019).  In *Heredia* the Ninth

Circuit concluded the government breached the plea agreement even

though it abided by the letter of the agreement.  The court

explained:

> Here, the parties agreed to recommend that Morales
> receive a prison term equal to the low end of the
> applicable Guidelines range plus a three-year term
> of supervised release.  The government breached
> its agreement, however, through its repeated and
> inflammatory references to Morales's criminal
> history in its sentencing memorandum. . . .
> [G]iven the opportunity to argue for the low-end
> sentence it had promised to recommend, the
> government offered a series of prejudicial
> "statements related to the seriousness of the
> defendant's prior record." *Whitney*, 673 F.3d at
> 971.  The central theme of the government's
> sentencing position was that Morales was a
> dangerous recidivist who had spent twenty years
> flouting the law and menacing others.  Whether
> intentional or not, the government breached the
> plea agreement by implicitly recommending a higher
> sentence than agreed upon.
>
> * * *
>
> Indeed, given the government's promise of
> leniency, it is notable that its sentencing
> memorandum contained no mitigating information at
> all.  Rather, it emphasized that Morales, a
> "danger to the community," needed to be

"deterre[d]" because of his "20-year criminal history," his "consistent disregard" for the law, and his criminal "propensity." The reader is left to wonder why the government believed a low-end Guidelines sentence was appropriate in the first place. Accordingly, we conclude that, as a whole and in context, the government's pejorative comments about Morales's criminal history and detailed descriptions of his prior offenses served "no purpose" but to argue for a harsher punishment than it had agreed to recommend. By implicitly advocating for a sentence other than the stipulated one, the government breached the plea agreement.

768 F.3d at 1232-34 (quotations omitted).

Here, in contrast, AUSA Gabriel's comments about the facts of this case and the nature of the charge were made in the context of addressing the Court's express concerns that a sentence less than a life sentence would be insufficient to achieve the goals of the sentencing guidelines. AUSA Gabriel, unlike the prosecutor in *Heredia*, did not make the promised recommendation "while winking at the district court' to impliedly request a different outcome." As noted, AUSA Gabriel acknowledged the Court's concerns about a sentence less than life and argued for a lesser sentence for Lawrence based on her cooperation, her history, her mental illness, her low IQ, and her particular situation. On this record, therefore, the Court concludes AUSA Gabriel did not implicitly or explicitly breach the Plea Agreement.

Accordingly, the Court concludes Lawrence's counsel did not provide ineffective assistance when they failed

to object to the government's alleged breach of the Plea
Agreement.

### C. Lawrence's Claim Based on Defense Counsel's Failure to Consider the Possibility that the Court Would Impose a Life Sentence

Lawrence asserts she received ineffective assistance of
counsel at sentencing when defense counsel failed to consider the
possibility that the Court would impose a life sentence.

Even if defense counsel's failure to appreciate fully
that the Court could impose a life sentence despite the Plea
Agreement fell below an objective standard of reasonableness, the
Lawrence fails to establish prejudice.  Lawrence does not
identify the way in which counsel's fuller appreciation of the
risk would have resulted in an alternative strategy at sentencing
and would have created a reasonable probability that she would
have received a lesser sentence.  The Court fully appreciated at
sentencing Lawrence's violent and difficult background and
circumstances as well as her mental illness, low IQ, and
significant assistance to the government when it decided on a
life sentence.  The Court also concluded the comparator cases
were unhelpful, and, therefore, the Court did not consider them.
In addition, the Court has already concluded AUSA Gabriel did not
breach the Plea Agreement.  Finally, even if the sentencing
hearing had not been bifurcated, the Court would still have been
deeply troubled by the facts of the crime and reached the same

conclusion that a sentence less than life would not achieve the goals of the sentencing guidelines.  The Court, therefore, concludes Lawrence has not established that the result of the proceeding would have been different but for defense counsel's failure to consider the possibility that the Court would impose a life sentence.

Accordingly, the Court concludes Lawrence's counsel did not provide ineffective assistance when he failed to consider the possibility that the Court would impose a life sentence.

### D. Lawrence's Claim Based on Counsel's Failure to Object to the Presentation and Use of Comparator Cases

Lawrence alleges she received ineffective assistance of counsel when counsel failed to object when the Court considered information beyond that contained in the record to sentence Lawrence.  Specifically, Lawrence asserts counsel should have objected to the government's presentation of "partial sentencing information about other cases in the District of Oregon," objected to the "Court's separate request for sentencing materials from other cases in the District of Oregon," and objected to "the Court's reliance on its own memory and recollection of the details from other murder cases in the District of Oregon."  Lawrence also asserts defense counsel provided ineffective assistance "[w]hen, at sentencing, the Court's statements made it plain that the Court considered defendants' conduct worse than that of others convicted of First

Degree Murder in the District of Oregon [and] defense counsel
failed to move for a continuance on the basis that the defense
had not had a fair or meaningful opportunity to understand,
evaluate, and present information about those cases."  The
government asserts Lawrence's claim related to use of the various
comparator cases is barred by the resolution of her direct
appeal.

Generally a defendant may not relitigate in a § 2255
proceeding those issues that have been resolved on appeal.  *See,
e.g., United States v. Redd*, 759 F.2d 699, 701 (9th Cir. 1985)
(The defendant "also claims . . . he was denied effective
assistance of counsel because his attorney failed to raise double
jeopardy, due process, res judicata, and collateral estoppel
challenges during his probation revocation hearing.  Since these
challenges [were raised and decided on appeal, they] would all
have been meritless, [and, therefore, the defendant] cannot claim
that his counsel's failure to raise them constituted ineffective
assistance."); *United States v. Ramirez*, 327 F. App'x 751, 752
(9th Cir. 2009)(The defendant "is barred from using a § 2255
motion to relitigate issues decided on direct appeal.").

On appeal of Lawrence's case the Ninth Circuit
dismissed Lawrence's claim that her "sentences were improperly
influenced by consideration of other crimes committed in the
District of Oregon" and explained:

> The [district] court . . . dismissed the other
> crimes that it considered as "not . . . reasonably
> comparable" to [Lawrence's] crime.  It then
> explained that the need to impose a comparable
> sentence in this case was an "academic" issue that
> was "[not] a factor that really provide[d] any
> help" in determining the correct sentence.  The
> consideration of other crimes thus appears to have
> played little if any role in the district court's
> sentencing decision.

*United States v. Lawrence*, 630 F. App'x 672, 675 (9th Cir. 2015).

Thus, in this case, as in *Redd*, any challenge by defense counsel

to the Court's use of comparator cases provided by the Probation

Office, the government, or the Court's own memory would have been

meritless because Lawrence's challenge to the use of comparator

cases was raised and dismissed on appeal.  The Court, therefore,

concludes Lawrence cannot claim defense counsel's failure to

object to the use of comparator cases constituted ineffective

assistance of counsel.  *See Ramirez*, 327 F. App'x at 752

("Therefore, even assuming the failure of Ramirez's attorney to

object to the admission of this testimony is deficient

performance, Ramirez cannot show prejudice because the testimony

was admissible.")(citing *Strickland*, 466 U.S. at 688)).

Accordingly, the Court concludes Lawrence's counsel did

not provide ineffective assistance when they failed to object to

the Court's consideration of information beyond that contained in

the record when sentencing Lawrence.

**E.  Lawrence's Claim for Defense Counsel's Comparison of Lawrence's Case to Outcomes under Oregon Law**

Lawrence asserts she received ineffective assistance of counsel when defense counsel "invited a comparison to [the outcome under] Oregon law in . . . Lawrence's sentencing submission and then pursued that comparison at sentencing."  Even if defense counsel's comparison to Oregon law fell below an objective standard of reasonableness under prevailing professional norms, which is questionable, the Court finds Lawrence has not established prejudice.

At sentencing the government expressly argued comparisons to state law are irrelevant, and the Court agreed. Specifically, the Court noted:

> I don't think there's a lot to argue about in terms of the comparison between the ways in which this conduct could have been charged [in state and federal court].  The fact is [Lawrence] admitted responsibility for conduct that is Murder in the First Degree, and she got the Government to agree to open the door to the Court exercising discretion for something other than a mandatory life sentence.  So I don't think this comparison [to state law] provides any help at all in trying to analyze, in the end, what is a reasonable sentence.

Def.'s Second Am. Mot. to Vacate, Ex. 209 at 120-21.  Thus, the Court did not consider defense counsel's comparison to state law in sentencing.  The Court, therefore, concludes Lawrence has not established "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."

Accordingly, the Court concludes Lawrence's counsel did

not provide ineffective assistance when he "invited a comparison to Oregon law in . . . Lawrence's sentencing submission and then pursued that comparison at sentencing" because the Court did not consider the state-law comparisons.

## IV. Ineffective Assistance Claims Based on Appeal

Lawrence alleges she received ineffective assistance of counsel on appeal when appellate counsel "failed to assert . . . the sentence of life imprisonment was substantively unreasonable." Lawrence also asserts appellate counsel provided ineffective assistance when he failed to argue that "the government's breach of a plea agreement warranted remand for re-sentencing before a different judge" and that "the 'harmless error' rule did not apply to the law of contractual plea agreements" and "failed to petition the appellate court for reconsideration or en banc review after it" applied the harmless-error rule.

### A. Lawrence's Claim that a Sentence of Life Imprisonment Was Substantively Unreasonable

Lawrence asserts she received ineffective assistance of counsel on appeal when counsel "failed to assert . . . the sentence of life imprisonment was substantively unreasonable." The Court concludes even if defense counsel's failure to assert on appeal that Lawrence's sentence was substantively unreasonable, Lawrence has not established prejudice.

The Ninth Circuit explained in *United States v. Fitch* that when "'determining substantive reasonableness, we are to consider the totality of the circumstances, including the degree of variance for a sentence imposed outside the Guidelines range.'" 659 F.3d 788, 798 (9th Cir. 2011)(quoting *United States v. Carty*, 520 F.3d 984, 993 (9th Cir. 2008)). "For a non-Guidelines sentence, we are to give due deference to the district court's decision that the § 3553(a) factors, on a whole, justify the extent of the variance." *Fitch*, 659 F.3d at 798 (quotation omitted). "We may not reverse just because we think a different sentence is appropriate." *Id*. The Ninth Circuit "afford[s] significant deference to a district court's sentence under 18 U.S.C. § 3553 and reverse[s] only if the court applied an incorrect legal rule" or if the sentence was "illogical, implausible, or without support in inferences that may be drawn from the facts in the record." *United States v. Martinez-Lopez*, 864 F.3d 1034, 1043 (9th Cir. 2017).

Lawrence concedes the Court "took note of [Lawrence's] mitigating life circumstances," but she asserts the Court "ultimately justified a life sentence based on the nature and circumstances of the conduct and the Court's perception that [Lawrence's] conduct was far worse than that of any other defendant sentences in the district for murder." Lawrence agrees the Court evaluated each of the § 3553 factors, and she does not

assert the Court failed to consider any mitigating circumstances. Instead Lawrence contends the Court should have balanced those factors differently. Thus, Lawrence has not established sufficient facts or cited any authority from which the Ninth Circuit could conclude Lawrence's sentence was "illogical, implausible, or without support in inferences that may be drawn from the facts in the record." The Court, therefore, concludes Lawrence has not established she was prejudiced by defense counsel's failure to assert on appeal that the sentence of life imprisonment was substantively unreasonable.

Accordingly, the Court concludes Lawrence's counsel did not provide ineffective assistance when he "failed to assert . . . the sentence of life imprisonment was substantively unreasonable."

**B.    Lawrence's Claims Related to Failure to Assert Breach of the Plea Agreement and Use of the Harmless Error Rule**

The Court has already concluded the government did not breach the Plea Agreement. The Court, therefore, also concludes Lawrence did not receive ineffective assistance of counsel on appeal when appellate counsel failed to argue the government's breach of a plea agreement warranted remand for resentencing before a different judge.

As to Lawrence's assertion that appellate counsel provided ineffective assistance on appeal when he failed to argue

that the "harmless-error" rule did not apply to the law of
contractual plea agreements, the Ninth Circuit has made clear
that it reviews the issue for plain error absent an objection to
an alleged breach of the plea agreement at trial. *See, e.g.,*
*United States v. Hernandez-Castro*, 814 F.3d 1044, 1045 (9ᵗʰ Cir.
2016)(reviewing the defendant's claim that the government
breached the plea agreement for plain error because the defendant
"did not raise this argument at sentencing.")(citing *Puckett v.*
*United States*, 556 U.S. 129, 135 (2009)); *United States v.*
*Gonzalez-Aguilar*, 718 F.3d 1185, 1187 (9ᵗʰ Cir. 2013)(same).
Lawrence, therefore, has failed to establish either that
appellate counsel's performance fell below an objective standard
of reasonableness under prevailing professional norms or that the
result of the proceeding would have been different "but for"
appellate counsel's errors.

Accordingly, the Court concludes Lawrence's counsel did not
provide ineffective assistance when he failed to argue that "the
government's breach of a plea agreement warranted remand for
re-sentencing before a different judge," failed to argue that
"the 'harmless error' rule did not apply to the law of
contractual plea agreements," and/or "failed to petition the
appellate court for reconsideration or en banc review after it"
applied the harmless error rule.

**V.   Lawrence's Claim Related to Cumulative Errors**

Finally, Lawrence asserts:  "To the extent that this Court were to conclude that the constitutional deprivations viewed individually were harmless, not prejudicial, or otherwise not warranting relief, it must conclude that the cumulative effect of the multiplicity of errors (in any combination) does."

The Ninth Circuit has "'granted habeas relief under the cumulative effects doctrine when there is a 'unique symmetry' of otherwise harmless errors, such that they amplify each other in relation to a key contested issue in the case.'"  *Smith v. Pennywell*, 742 F. App'x 230, 232 (9th Cir. 2018)(quoting *Ybarra v. McDaniel*, 656 F.3d 984, 1001 (9th Cir. 2011)).  Although Lawrence points to a number of alleged potential errors, the Court has concluded most of the items identified are not error or that Lawrence has not established prejudice.  The Court, therefore, concludes Lawrence "has failed to establish a 'unique symmetry' of errors that amplify a key contested issue."  *Smith*, 742 F. App'x at 232.

In summary, the Court denies Lawrence's Second Amended Motion to Vacate, Set Aside or Correct Sentence.  In addition, the Court finds Lawrence has not made a substantial showing that she was denied a constitutional right, and, therefore, the Court declines to issue a Certificate of Appealability.


**<u>CONCLUSION</u>**

For these reasons, the Court **DENIES** Lawrence's Second Amended Motion (#281) Under 28 U.S.C. § 2255 to Vacate, Set Aside or Correct Sentence by A Person in Federal Custody and **DECLINES** to issue a Certificate of Appealability.

IT IS SO ORDERED.

DATED this 16th day of August, 2019.


/s/ Anna J. Brown

_____
ANNA J. BROWN
United States Senior District Judge